2020 PA Super 3

| | | |
|---|---|---|
| LOUIS MCFEELEY, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF KATHLEEN MCFEELEY, DEC. | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | : : : | |
| v. | : : : | No. 3255 EDA 2017 |
| SUSHRUT SHAH, M.D., MPH, DIAGNOSTIC IMAGING, INC. | : : | |

Appeal from the Judgment Entered September 21, 2017
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  October Term, 2014, No. 000331


BEFORE:   PANELLA, P.J., STABILE, J., and STEVENS, P.J.E.*

OPINION BY STEVENS, P.J.E.:                **FILED JANUARY 08, 2020**

Appellant Louis McFeeley, individually and as administrator of the estate of his wife, Kathleen McFeeley ("the Decedent"), appeals from the entry of judgment in favor of Appellees Sushrut Shah, M.D., MPH ("Dr. Shah") and Diagnostic Imaging, Inc. ("Diagnostic Imaging").[1]  After a careful review, we affirm.

The relevant facts and procedural history are as follows: On October 7, 2014, Appellant filed a civil complaint against Appellees averring that, on April

_____

* Former Justice specially assigned to the Superior Court.

[1] Appellant named additional parties as defendants in the underlying civil complaint; however, the additional defendants were dismissed by leave of court on April 18, 2017.

26, 2012, the Decedent presented to her primary care physician with complaints of pain in her stomach/abdomen. The primary care physician referred the Decedent to a colorectal surgeon, Robin Rosenberg, M.D., who ordered various tests, including an abdominal/pelvic computed tomography scan ("CT scan").  On May 3, 2012, the Decedent underwent the CT scan at the Aria Health outpatient clinic in Philadelphia; Dr. Shah, who was employed by Diagnostic Imaging, reviewed the CT scan.

Appellant alleged the CT scan revealed multiple mass lesions along the Decedent's left anterior lower abdomen and upper pelvis. Appellant further averred the lesions were "indicative of metastatic disease until proven otherwise." Appellant's Complaint, filed 10/7/14, at 6.  However, Appellant contended Dr. Shah's CT scan report failed to mention the presence of the multiple lesions, and, consequently, Dr. Shah "failed to detect or appreciate the presence of these abnormalities in his review and interpretation of the CT scan images." *Id.*

Appellant alleged the Decedent's abdominal pain continued, and on December 10, 2012, she was examined again by Dr. Rosenberg, who ordered a series of X-rays, which revealed "slight abnormalities in the right lung[.]" *Id.* at 7.  The Decedent began to experience shortness of breath, and on December 12, 2012, she went to Aria Health-Torresdale Hospital's emergency room.  An initial CT scan revealed "abnormal nodules along the diaphragm, [which is a concern] for malignancy, and abdominal ascites in the upper

abdomen, [which is a concern] for peritoneal carcinomatosis." *Id.* It was recommended that the Decedent follow-up with abdominal/pelvic CT scans.

Appellant averred that, on December 14, 2012, the Decedent underwent an abdominal/pelvic CT scan at Aria Health-Torresdale Hospital. This CT scan revealed "abdominal and pelvic ascites, ill-defined nodular soft tissue densities along anterior aspects of the left hemi-abdomen, suggesting peritoneal and/or omental tumors." *Id.* On December 19, 2012, the Decedent followed-up with Enrique Hernandez, M.D., a gynecologist oncologist at the Temple University Hospital, who found the Decedent had a "15-18 cm mass in the left lower quadrant of the abdomen[.]" *Id.* He diagnosed the Decedent as suffering from Stage IV ovarian cancer, and he recommended a full hysterectomy.

On December 26, 2012, the Decedent underwent the planned surgery; however, because of extensive tumors, Dr. Hernandez was unable to perform the hysterectomy, but he performed "suboptimal debulking of the tumor."[2] *Id.* at 8. Appellant contended the Decedent was discharged from the Temple University Hospital on January 1, 2013, with plans to undergo chemotherapy; however, after developing various symptoms, she returned to the Temple University Hospital on January 5, 2013, with a confirmed small bowel obstruction.

---

[2] In a "debulking surgery," the surgeon attempts to reduce the amount of the tumor. N.T., 4/24/17, at 101.

Despite surgery to repair the bowel obstruction, the Decedent developed peritonitis and septicemia, and on January 14, 2013, she died while in the Temple University Hospital. Appellant averred the "cause of death was cardiopulmonary arrest from sepsis caused by the bowel perforation, related to Stage IV ovarian cancer." *Id.* at 9.

Appellant alleged the success of chemotherapy with ovarian cancer is dependent on the successful debulking of the tumor, and if the tumor can be only suboptimally debulked the likelihood of successful cancer treatment is decreased. *Id.* Accordingly, Appellant contended that a correct interpretation of the CT scan on May 3, 2012, by Dr. Shah would have resulted in a prompt referral to a gynecologist oncologist, as well as an optimal debulking of the tumor such that chemotherapy could be administered with "a significant chance for long-term survival." *Id.* Appellant asserted the delay resulted in enlarged and extensive tumors.

Further, Appellant alleged "[t]he delay in diagnosis and treatment of the carcinoma from May 2012 until early January 2013 increased the likelihood of a complication such as bowel perforation and sepsis." *Id.* at 10. Accordingly, "the delay in diagnosis and treatment from May 2012 to late December 2012/early January 2013, increased the risk of harm to [the Decedent]." *Id.*

As such, Appellant presented survival claims on the Decedent's behalf[3] and wrongful death claims on his and his son's behalf[4] alleging professional medical negligence against Appellees.[5]

On November 18, 2014, Appellees filed an answer with new matter to Appellant's complaint, and on November 24, 2014, Appellant filed a reply to the new matter. Moreover, Appellant filed various motions *in limine*, including a motion to preclude certain causation testimony from defense expert Seth Glick, M.D. By order entered on April 24, 2017, the trial court denied Appellant's motion *in limine* as to Dr. Glick; however, the trial court noted Dr. Glick's testimony would be limited to the four corners of his expert report.

At the ensuing jury trial, Appellant presented the testimony of various witnesses. Specifically, Dr. Rosenberg relevantly testified that he ordered the Decedent to undergo a CT scan, which was performed on May 3, 2012, and he received a report from Dr. Shah. N.T., 4/24/17, at 88. He indicated the CT scan was reported by Dr. Shah as "completely negative" and "all visualized

---

[3] *See* 42 Pa.C.S.A. § 8302 (Survival Act provides "[a]ll causes of action or proceedings, real or personal, shall survive the death of the plaintiff or of the defendant....").

[4] *See* 42 Pa.C.S.A. § 8301(a), (b) (Wrongful Death Act provides spouse, children, or parents of decedent can bring action "to recover damages for the death of an individual caused by the wrongful act or neglect or unlawful violence or negligence of another").

[5] In Pennsylvania, wrongful death claims are separate and distinct from survival claims, although both involve allegations of negligence against the defendant. *See Dubose v. Quinlan*, 643 Pa. 244, 173 A.3d 634 (2017).

pelvic structures [were] unremarkable." *Id.* He noted that "[w]e now know in retrospect that all the pelvic structures actually weren't seen, but that wasn't detailed in the report." *Id.*

Dr. Rosenberg testified that, at this point, he had no reason to believe the Decedent was suffering from ovarian cancer. *Id.* at 93. Dr. Rosenberg testified that in December of 2012, with her condition worsening, the Decedent went to the Temple University Hospital where she underwent surgery for ovarian cancer, and she sustained a perforated colon. *Id.* at 98-99.

Daniel Aaron Cousin, M.D., a diagnostic radiologist offered as an expert by Appellant, testified he reviewed the May 3, 2012, CT scan and "there were some findings which were not described in [Dr. Shah's] report." *Id.* at 160. Specifically, Dr. Cousin noted the CT scan revealed the Decedent had "omental lesions,"[6] which are indicative of cancer, but such findings were not documented on Dr. Shah's report. *Id.* at 161. He noted the reasonable standard of care for a radiologist is to describe such findings on the report. *Id.* at 163. He specifically opined that Dr. Shah breached the reasonable standard of care by failing to report such findings with regard to the May 3, 2012, CT scan. *Id.* at 188.

---

[6] Dr. Cousin explained the omentum drapes over the front of a person's stomach. *Id.* at 160-62.

Moreover, Dr. Cousin testified that a comparison of the CT scans from May 3, 2012, and December 14, 2012, revealed "significant worsening of the disease." *Id.* at 164, 194. He indicated "her disease [had] spread" with new and/or larger lesions appearing in the December 14, 2012, CT scan. *Id.* at 176. Dr. Cousin admitted, however, that as of May 3, 2012, there was evidence that the Decedent's cancer had already metastasized. *Id.* at 204.

Dr. Shah was called by Appellant as on cross-examination. Dr. Shah admitted he reviewed the Decedent's May 3, 2012, CT scan, and it was his duty to report anything "suspicious and abnormal" appearing on the scan. N.T., 4/25/17, at 19. He also admitted it is his duty to report lesions appearing on the omentum. *Id.* at 28-29.

Dr. Shah confirmed he did not report seeing any omental lesions on the Decedent's May 3, 2012, CT scan; however, he testified he was unable to remember whether he actually saw or did not see the omental lesions when he reviewed the Decedent's May 3, 2012, CT scan. *Id.* at 30. Upon reviewing the CT scan in court, Dr. Shah admitted there were at least two areas on the CT scan which could be omental lesions. *Id.* at 41-42.

Michael Hopkins, M.D., a gynecologist oncologist offered as an expert by Appellant, explained that a staging system is used with regard to cancer in order to give a prognosis as to a patient's chances of surviving the cancer. *Id.* at 70. He explained that Stage III-A is when there is no disease visible to the eye; Stage III-B is when the cancer is less than 2 centimeters; and Stage

III-C is beyond 2 centimeters. *Id.* He opined that, based on the lesions appearing on the Decedent's May 3, 2012, CT scan, she was in Stage III-C of ovarian cancer at this time. *Id.*

Dr. Hopkins testified that with a Stage III-C cancer the treatment is to attempt to remove as much of the visible cancerous tissue as possible through surgery and then chemotherapy is used. *Id.* Dr. Hopkins opined chemotherapy is more effective if less disease is left behind after surgery. *Id.* In this respect, he testified as follows:

> **Q.** With respect to Stage III-C treatment, tell us what is the likelihood of success of getting debulking considering that stage in the surgery.
>
> **A.** If we are able to what we call optimally debulk or get it down to less than a centimeter to no visible disease, the chances of living five years falls in the range of 40 to 50 percent. If we leave quite a bit of disease behind, then they fall to 20 percent.
>
> **Q.** Doctor, do you have an opinion to a reasonable degree of medical certainty whether if this cancer was diagnosed in May of 2012, what type of—whether the success rate or the likelihood that the Decedent could have received an optimal debulking surgery?
>
> **A.** I think she probably would have, given the CT findings.
>
> **Q.** Tell us why you say that?
>
> **A.** That was the only thing they saw. Oftentimes we see, when we can't get it all out, we see many more findings on CT scan[s]. We see the fluid build-up, many other nodules and bits of tumor in the abdomen. So that CT scanning would have been pretty favorable to go in expecting to get an optimal resection on that.
>
> **Q.** So if [the Decedent] was your patient and she came to you, you would have felt pretty confident that you could have gotten a success of removing the cancer?
>
> **A.** I would have expected to.
>
> ***

**Q.** Doctor, let's talk about [the Decedent] developing a perforation after the surgery in December of 2012. Now, do you have an opinion to a reasonable degree of medical certainty whether if the cancer was diagnosed in May of 2012, whether a complication such as a perforation would have been decreased or less?

**A.** Yes, it would have been a far easier surgery.

***

**Q.** And, Doctor, you talked about [a patient's] chance of living at a Stage III-C level. Talk to the Jury about [a patient's] chance of living after an optimal debulking and the chemotherapy?

**A.** We usually quote the patient somewhere in the 40 to 50 percent chance they'll be alive in five years with no cancer.

**Q.** And that doesn't mean--does that mean that they could live longer than five years, too?

**A.** Correct.

**Q.** You have patients with III-C who have gone through that surgery and the chemo that live longer?

**A.** I still see some in the office 25, 30 years later, so yes.

**Q.** Now, fast forward to me or let's move forward seven months later to December of 2012. At that point in time, what was the stage of [the Decedent's] cancer?

**A.** At that time she was Stage IV.

**Q.** Doctor explain to the Jury the difference between Stage III-C and Stage IV cancer.

**A.** Again, we use it as a predictor. Stage IV is when we have liver metastases or what's called a pleural effusion where the fluid is up around the lung and it's above the diaphragm. When we find that, then the chances of living drop down in the five to 10 percent range.

**Q.** At III-C, they're 40 to 50 percent. At IV, they're five to 10 percent?

**A.** Yes.

*Id.* at 71-76.

Dr. Hopkins testified that Dr. Hernandez perforated the Decedent's bowel during surgery; however, he opined this did not constitute negligence

as such a complication is an acceptable risk of the procedure. *Id.* at 83. Dr. Hopkins opined the surgery performed in December by Dr. Hernandez was more difficult than the surgery would have been if it were performed in May. *Id.* In this regard, he indicated that the fact the Decedent's cancer progressed from Stage III-C to Stage IV from May to December resulted in an "exceedingly more difficult [surgery] leading to…the ultimate perforation and then her death." *Id.* at 89.

On cross-examination, Dr. Hopkins admitted that, as of May 3, 2012, the Decedent's cancer was already metastatic, and the American Cancer Society's published survival rates for cancer at Stage III-C is 39 percent. *Id.* at 95-96. He acknowledged the American Cancer Society's published survival rates for cancer at Stage IV, which is the stage of the Decedent's cancer in December of 2012, was 17 percent. *Id.* at 97.

He also admitted that all surgeries have risks and, even if the Decedent underwent the debulking surgery in May, as opposed to December, the surgery could have been "quite difficult." *Id.* at 99. He acknowledged that Dr. Hernandez indicated in his report that the area where the Decedent's bowel perforation occurred was not in the area where he performed the surgery. *Id.* at 109.

In opposition to Appellant's claim, Appellees offered the testimony of numerous witnesses. Specifically, Dr. Shah admitted the May 3, 2012, CT scan was not a "normal" CT scan; however, he indicated that he noted on the

report the thickening of the Decedent's colon, which he viewed on the CT scan.[7]  N.T., 4/26/17, at 49.  Dr. Shah testified he did not report the Decedent's omental lesions because "they're not uncommon and we basically don't report them unless there's some secondary information such as fluid in the belly [or a known patient or family history of some disease]."  *Id.* at 51-52.  Dr. Shah indicated he typically reports only the "highlights" of the CT scan as a doctor does not want to receive a twenty page report.  *Id.* at 52.  Dr. Shah testified that based on the information provided to him he "rendered an accurate report" of the Decedent's May 3, 2012, CT scan.  *Id.* at 53.

On cross-examination, Dr. Shah testified he cannot specifically recall whether at the time he reviewed and reported the Decedent's May 3, 2012, CT scan he noticed the omental lesions.  *Id.* at 54.  In any event, Dr. Shah testified that even if he had noticed the omental lesions he "wouldn't necessarily [have] report[ed] them because they are not uncommon findings[.]"  *Id.* at 55.  However, upon further questioning, he admitted that if he noticed an omental lesion, which could potentially be cancer, it was his "job to report it[.]"  *Id.* at 61.

---

[7] The parties stipulated that Dr. Shah was acting in the course and scope of his employment with Diagnostic Imaging when he reviewed and reported the Decedent's May 3, 2012, CT scan.  *Id.* at 73.

Seth Glick, M.D., a diagnostic radiologist offered as an expert by Appellees,[8] opined to a reasonable degree of medical certainty that Dr. Shah used the same care as other radiologists in his interpretation of the May 3, 2012, CT scan. *Id.* at 88. He noted Dr. Shah properly reported thickening of the Decedent's colon. *Id.* at 89. Dr. Glick specifically disagreed with Dr. Cousin's opinion that Dr. Shah should have reported the omental lesions. *Id.* at 89-90. In this regard, he noted there were "some vague densities in the omentum, which we see commonly in many CT scans. Those are not changes that we report because if we report in so many people, you'd be sending everybody for more tests." *Id.* at 90.

Dr. Glick disagreed with Dr. Cousin's opinion that the "subtle patchy densities in the omentum" would have offered a reasonable explanation for the Decedent's reported pain. *Id.* at 91. Dr. Glick concluded there was nothing visible in the May 3, 2012, CT scan which should have been reported as "abnormal" as it related to the Decedent's omentum. *Id.* at 92.

With regard to the bowel perforation sustained by the Decedent, Dr. Glick opined the perforation resulted from "the disease of the sigmoid colon which was most likely diverticulitis." *Id.* at 94. That is, he disagreed with Appellant's experts that the bowel perforation, which led to sepsis and the

---

[8] The trial court accepted Dr. Glick as an expert in the field of diagnostic radiology, and more specifically, as an expert in gastrointestinal radiology. *Id.* at 86.

Decedent's ultimate death, resulted from the December 26, 2012, surgery related to the Decedent's cancer. In this regard, he relevantly testified as follows:

**Q.** Based on your review of all [the] imaging, did you come to an opinion as to what caused [the] perforation?

**A.** I did.

**Q.** First of all, was there a perforation?

**A.** Yes, the perforation could be seen on the January 5th study from 2013. There was a perforation there.

**Q.** Please explain to the Members of the jury what your opinion is from a radiological perspective as to what may have caused that perforation.

**A.** The perforation that I saw on that January study was coming from the posterior wall of the sigmoid colon, that was the same area that was thickened on the May, 2012 study, which was the area of the perforation. It was not near the tumor or anywhere near [the] tumor that I could see in the belly at that particular point in time or on the December study. My opinion was the perforation occurred from the disease of the sigmoid colon which was most likely diverticulitis.

**Q.** In coming to your opinion, did you review the statement under oath, the deposition that the plaintiff's attorney took of the surgeon, Dr. Hernandez?

**A.** I did.

**Q.** Do you recall what Dr. Hernandez said about the location of the perforation when it was discovered?

**A.** Yes, he said that the perforation was not in the area where he was operating.

**Q.** Did Dr. Hernandez have any explanation in his deposition as to what caused the perforation?

**A.** He did not.

∗∗∗

**Q.** Doctor, we were discussing the cause of the perforation that was caused or was discovered in January, 2013?

**A.** Yes.

**Q.** In coming to your conclusion as to the cause of the perforation, did you undertake a review of earlier studies to assist you in coming to that opinion, like the barium enema or the earlier CT scans?

\*\*\*

**A.** Indirectly, yes. [The] [b]arium enema showed a kinking of the sigmoid colon and thickening of the wall and showed diverticulosis or little sacculations or outpouchings of the colon. So we knew the patient had diverticular disease and had kinking, which is usually due to adhesions. On the [CT] scan from May of 2012 I could see very subtle linear lines coming from the sigmoid colon and going down into the fat around it, which means there's been a prior episode of inflammation in that area. So I knew the patient had a prior bout of diverticulitis. So what we call this is chronic diverticular disease or chronic diverticulitis. It may not be acutely symptomatic, but we know the patient has had prior inflammation of these diverticuli. So the thickening and the diverticuli and adhesions and the kinking told me there was an underlying process there. When I saw the perforation in the January 5th study, I could actually see the point where it was coming from the bowel, and it was actually coming from that same segment. So it could only be one conclusion that that sigmoid colon was the cause of the perforation.

*Id.* at 93-96.

On cross-examination, Dr. Glick admitted that when he reviewed the May 3, 2012, CT scan for the purposes of trial he "saw something in the omentum" and, in retrospect, there were metastatic lesions in the Decedent's omentum. *Id.* at 97. He admitted the lesions enlarged from May 3, 2012, to December 14, 2012, when another CT scan was done. *Id.* at 98-99. However, he testified that it does not fall below the standard of care to not report the lesions because they are "common" and it is a "rare event" that the lesions are cancer. *Id.* at 99.

- 14 -

Moreover, on cross-examination, Dr. Glick reiterated that, in his opinion, the Decedent's bowel perforation was not caused by a surgery. *Id.* at 110. Specifically, he testified as follows:

**Q.** And, you basically believe that she had this major surgery on the 26th of December, and within a little bit more than a week afterwards, ten days she's being operated on and [the perforation] has nothing to do with the surgery?

**A.** That is my opinion.

**Q.** And it was at that time that this diverticulitis that you claim was present back in May suddenly ruptured and started, right?

**A.** Yes.

**Q.** You would agree with me that you're the only one that says any test back in May show diverticulitis, right?

**A.** Yes.

**Q.** Like we know Dr. Glick, in his [CT] scan, he said he didn't see diverticulitis, right-I mean, Dr. Shah. We can just put it up right here. There is no colonic diverticulosis with no definitive evidence of diverticulitis. Dr. Glick, you would agree with me that Dr. Shah did not find diverticulitis in May of 2012, right?

**A.** He did not report diverticulitis. He reported thickening of the colon and diverticulosis. In my opinion at that time there was not acute diverticulitis, but chronic diverticular disease in which there's low grade inflammation, which may or may not cause symptoms, but he did not report diverticulitis, but the changes were present consistent with that.

**Q.** Then we have a barium enema performed in the end of May after the [CT] scan that also said no evidence of diverticulitis, right?

**A.** Right.

**Q.** Then we have from May, seven months, until December of 2012 with no doctor appointments, visits, no diagnosis of diverticulitis, right?

**A.** Correct.

**Q.** Then she [goes] into the hospital in December with cancer, right?

**A.** Yes.

**Q.** And they do a [CT] scan in December, right?

**A.** Yes.

**Q.** And in that [CT] scan in December, less than a month before her death, they also note no diverticulitis, right?

**A.** Right. Now on that [CT] scan you could not see the sigmoid colon that well because of other things taking place.

**Q.** But you would agree with me that if we got a [CT] scan now in December, less than a month before she passes [and] it says no evidence of diverticulitis, right?

**A.** Yes, and I would also offer that with my experience in gastrointestinal radiology that I was able to detect subtle changes of chronic diverticulitis which may have not been appreciated at that time. It doesn't mean it causes symptoms or anybody would complain, but the pathological changes are there. I could see them.

**Q.** So the radiologist in December who is reading that [CT] scan, he missed that. He missed the diverticulitis, right?

**A.** He didn't miss it. As I said, you couldn't really see it in December. Like I said, it's not acute diverticulitis, it's chronic diverticular disease, which is low-grade inflammation in the wall causing thickening, and that's what was present.

**Q.** You would agree with me that neither Dr. Hernandez nor Dr. Farris in their operative reports noted any diverticulitis or inflammation of the colon, did they?

**A.** Well, they didn't resect the sigmoid colon. They couldn't tell unless you do a pathologic examination. There's a distinction between acute and chronic diverticulitis, and I'm saying this is chronic diverticulitis.

**Q.** Just so I'm clear, you testified that the location of the perforation was the sigmoid colon, right?

**A.** Correct.

**Q.** Dr. Farris, not Dr. Hernandez, performed that [surgery to repair the] perforation, right?

**A.** Right.

**Q.** So Dr. Hernandez, he wasn't even there when the perforation was actually visually seen and the surgery was performed [to repair it], right?

**A.** Right.

- 16 -

*Id.* at 111-14.

On redirect-examination, Dr. Glick reiterated his opinion that Dr. Shah complied with the standard of care with respect to the Decedent's May 3, 2012, CT scan. *Id.* at 117.

David Warshal, M.D., a gynecologist oncologist called as an expert by Appellees, testified he disagreed with Dr. Hopkins' testimony that there would have been less chances of major complications if the Decedent would have underwent the debulking surgery in May of 2012 as opposed to December of 2012. *Id.* at 129. He opined that "even as of May there was probably a significant amount of disease down…in the base of the pelvis." *Id.* at 131. He indicated the risk of complications from surgery would have been "the same" whether the surgery occurred in May or December. *Id.* at 131-32. He noted:

> [I]t was very unlikely even in a surgery like Dr. Hernandez performed [in December] for there to be a bowel perforation. And very unlikely that it would end up, unfortunately, in death. If the surgery had been done in May,…the likelihood is they would have needed to do a fairly radical procedure that likely would have required some bowel resection, and especially that increases the patient's risk for having significant complications, and even death. So I would put the risk for the two surgeries at about the same.

*Id.* at 132.

Dr. Warshal opined that the Decedent did not die from cancer. *Id.* at 136. Rather, her cause of death was sepsis secondary to the bowel

- 17 -

perforation. *Id.* He testified that sepsis is treatable, but it is a very serious problem. *Id.*

On cross-examination, Dr. Warshal admitted that, from May of 2012 to December of 2012, the Decedent's cancer progressed from Stage III-C to Stage IV, and the survival rate between Stage III and Stage IV is "cut in half." *Id.* at 139. He opined it was likely the bowel perforation resulted from the primary surgery, which was performed by Dr. Hernandez on December 26, 2012. *Id.* at 143. He also opined it was less likely the Decedent would have sustained a perforation had she underwent surgery in May. *Id.* at 144. However, Dr. Warshal opined that the Decedent would have been at greater risk for other types of surgical complications if she had the surgery in May as opposed to December. *Id.*

At the conclusion of trial, the jury found Appellees were negligent; however, the jury determined the negligence was not the factual cause of harm to the Decedent. Appellant filed a timely post-trial motion, which the trial court denied on August 28, 2017. On September 21, 2017, judgment was entered in favor of Appellees, and Appellant filed a timely notice of appeal. The trial court directed Appellant to file a Pa.R.A.P. 1925(b) statement, Appellant timely complied,[9] and the trial court filed a responsive Pa.R.A.P. 1925(a) opinion.

---

[9] In his Rule 1925(b) statement, Appellant alleged the following (verbatim):

On appeal, Appellant presents the following issues in his "Statement of the Questions Involved" (verbatim):

A. Whether the trial court erred in ruling that the jury verdict on the issue of factual cause of harm to Decedent was not against the weight of the evidence, where plaintiff and defense expert witnesses at trial were in agreement as to the cause of the sepsis which resulted in Decedent's death, and were in agreement that the delay in diagnosis and treatment of Decedent's cancer resulted in increased risk of colon perforation and decrease in 5 year survival prognosis.

B. Whether the trial court erred in permitting a defense radiology expert to offer opinions at trial on medical matters outside the expert's knowledge, education, training and experience, specifically the cause of Decedent's colon perforation.

Appellant's Brief at 5 (suggested answers omitted).

In his first issue, Appellant contends the trial court improperly denied his post-trial motion seeking a new trial based on the weight of the evidence.[10]

---

A. The trial court erred in ruling that the jury verdict on the issue of factual cause of harm to Decedent was not against the weight of the evidence, where plaintiff and defense expert witnesses at trial were in agreement as to the cause of the sepsis which resulted in Decedent's death, and were in agreement that the delay in diagnosis and treatment of Decedent's cancer resulted in increased risk of colon perforation and decrease in 5-year survival prognosis.

B. The trial court erred in permitting a defense radiology expert to offer opinions at trial on medical matters outside the expert's knowledge, education, training and experience, specifically the cause of Decedent's colon perforation.

Appellant's Rule 1925(b) Statement, filed 12/8/17, at 1-2.

[10] To the extent Appellant also presents on appeal a sufficiency of the evidence challenge, we note the issue is waived. Appellant did not present any claim related to the sufficiency of the evidence in his court-ordered Rule 1925(b) statement. *See* Pa.R.A.P. 1925(b)(4)(vii).

Specifically, he contends the jury's verdict concluding that Dr. Shah's negligence was not the factual cause of the Decedent's injury (and ultimate death) is against the weight of the evidence. In this regard, Appellant asserts experts for both Appellant and Appellees agreed that the debulking surgery performed on December 26, 2012, caused a perforation to the Decedent's bowel, which led to sepsis and the Decedent's ultimate death.

Moreover, he contends these same experts agreed the Decedent's cancer worsened from May to December, and, thus, there was a significant reduction in her five year survival expectation, as well as an increase in the risk of a colon perforation during surgery. Accordingly, Appellant argues it is uncontroverted that the risk of harm to the Decedent was increased due to the delay in diagnosis and treatment resulting from Dr. Shah's negligence in reviewing and reporting on the May 3, 2012, CT scan, and therefore, the jury's verdict as to causation is against the weight of the evidence.

Initially, we note the following relevant legal precepts:

> Appellate review of a weight claim is a review of the [trial court's] exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

> *In re Estate of Smaling*, 80 A.3d 485, 490 (Pa.Super. 2013) [(*en banc*)]. The factfinder is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. The trial court may award a judgment notwithstanding the verdict or a new trial only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice. In determining whether this standard has been met, appellate review is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion. When a fact finder's verdict is so opposed to the demonstrative facts that looking at the verdict, the mind stands baffled, the intellect searches in vain for cause and effect, and reason rebels against the bizarre and erratic conclusion, it can be said that the verdict is shocking.

*Haan v. Wells*, 103 A.3d 60, 70 (Pa.Super. 2014) (citations, quotations, and quotation marks omitted). However, "[i]f there is any support in the record for the trial court's decision to deny the appellant's motion for a new trial based on weight of the evidence, then we must affirm. An appellant is not entitled to a new trial where the evidence presented was conflicting and the fact-finder could have decided in favor of either party." *Corvin v. Tihansky*, 184 A.3d 986, 992-93 (Pa.Super. 2018) (quotation and quotation marks omitted).

> To prevail in any negligence action, the plaintiff must establish the following elements: the defendant owed him or her a duty, the defendant breached the duty, the plaintiff suffered actual harm, and a causal relationship existed between the breach of duty and the harm….[T]o establish the causation element in a professional malpractice action, the plaintiff must show that the defendant's failure to exercise the proper standard of care caused the plaintiff's injury.

*Freed v. Geisinger Medical Center*, 910 A.2d 68, 72-73 (Pa.Super. 2006) (citations omitted). *See Renna v. Schadt*, 64 A.3d 658 (Pa.Super. 2013)

- 21 -

(holding that in negligence action the plaintiff must demonstrate the defendant was the factual cause of injury to the plaintiff).

In the case *sub judice*, Appellant's weight of the evidence claim is focused on the causation element; *to wit*, Appellant contends the jury's verdict that Dr. Shah's negligence was not a factual cause of the Decedent's injuries (and ultimate death) is against the weight of the evidence. In rejecting this claim, the trial court relevantly indicated the following:

> During trial, [Appellant] presented expert medical testimony that the 7-month delay in surgical treatment of the cancer significantly increased the risk of surgical complications, such as a colon perforation, and that [the Decedent] did, in fact, sustain a perforated colon as a result of a December 26, 2012, surgery performed by Dr. Enrique Hernandez resulting in sepsis which led to [the Decedent's] death.
>
> [Appellant] suggests that the testimony presented by [his] expert, Michael Hopkins, M.D., and defense expert, David Warshall, M.D., was in agreement that the risk of harm to the patient was increased such that the weight of the evidence regarding the causation issue warranted a finding in [Appellant's] favor. Despite [Appellant's] contention, the testimony taken as a whole from Dr. Hopkins and Dr. Warshal, as well as from other witnesses, was not in complete agreement, or as [Appellant] suggests, uncontroverted. Rather, there was ample evidence at trial contradicting and rebutting Dr. Hopkins' opinions on the cause of the perforation; the differences in the various risks associated with the debulking surgeries in May 2012 versus December 2012; and the meaning and weight to be attributed to the survival rates discussed by the experts at trial. In fact, the record reflects that [Appellees' expert,] Dr. Warshal[,] began his testimony by expressly stating that he disagreed with Dr. Hopkins and he explained in detail the nature and extent of his disagreement. Further, despite [Appellant's] contention that the colon perforation was the result of Dr. Hernandez' surgery, defense expert witness Dr. Glick testified in the alternative that diverticulitis…[was] the cause [of the bowel perforation]. This was a fact for the jury to determine.

\*\*\*

> Despite [Appellant's] contention, although the experts may have been in agreement on some aspects of [the Decedent's] care, their opinions and conclusion[s] were clearly diverse to one another. As to which opinion carried more weight and credibility was clearly within the purview of the jury as the finder of fact.

Trial Court Opinion, filed 5/6/19, at 3, 5 (citations to record omitted).

The trial court found nothing about the verdict shocked its sense of justice or required a new trial. Mindful of our limited scope of review of a weight of the evidence claim, our obligation is to respect the fact finder's credibility determinations and the weight it accords the evidence; consequently, we find no basis to challenge the trial court's denial of a new trial. **See Corvin**, **supra**.

In his second issue, Appellant contends the trial court erred in denying his motion *in limine* to exclude Dr. Glick, a radiologist, from providing expert testimony on the issue of causation of the Decedent's bowel perforation. Specifically, Appellant contends Dr. Glick's testimony on causation (*i.e.*, that the cause of the Decedent's bowel perforation was diverticulitis) violated Pennsylvania's common law governing the admission of expert testimony, as well as the Medical Care Availability and Reduction of Error Act ("MCARE Act"), 40 P.S. § 1303.512.

First, Appellant contends the trial court erred in concluding Dr. Glick qualified as an expert for purposes of causation pursuant to the common law standard. Specifically, Appellant argues Dr. Glick is a board-certified

radiologist who does not diagnose or treat disease, has no direct patient contact, and does not perform surgery such that he was not qualified to opine as to the cause of the Decedent's bowel perforation. *See* Appellant's Brief at 30.

Initially, we note the following:

> When we review a ruling on the admission or exclusion of evidence, including the testimony of an expert witness, our standard is well-established and very narrow. These matters are within the sound discretion of the trial court, and we may reverse only upon a showing of abuse of discretion or error of law. An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous. In addition, [t]o constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party.

*Freed*, 910 A.2d at 72 (quotations and quotation marks omitted).

> In general, to qualify as an expert witness, one must only "possess more expertise than is within the ordinary range of training, knowledge, intelligence, or experience." Thus, in determining whether to admit expert testimony, the usual test to be applied is "whether the witness has a reasonable pretension to specialized knowledge on the subject matter in question."
>
> Applying this broad standard for expert testimony to an issue of medical causation, this Court [has held]…that "an otherwise qualified non-medical expert [may] give a medical opinion so long as the expert witness has sufficient specialized knowledge to aid the jury in its factual quest."

*Freed*, 910 A.2d at 73 (footnote, citations, and quotations omitted). "If a witness possesses neither experience nor education in a subject matter under investigation, the witness should be found not to qualify as an expert."

***Yacoub v. Lehigh Valley Med. Assocs., P.C.***, 805 A.2d 579, 591 (Pa.Super.

2002) (*en banc*).

Here, the trial court held the following:

> Seth Glick, M.D., a defense expert witness, was presented for direct examination and cross-examination on *voir dire*. As explained to the jury, he had been a radiologist for over 35 years. He is fellowship-trained in abdominal CT scanning and gastrointestinal radiology. He explained that his sub-specialization in the field of gastrointestinal radiology involves imaging of the upper gastrointestinal tract and the lower gastrointestinal tract in the small bowel. He also testified that he has a full knowledge of the diseases of the gastrointestinal tract and symptoms and findings that are associated with them. [The trial] court determined that Dr. Glick was more than a [*sic*] qualified to testify to the opinions he gave in this case including the cause of the perforation. He was rebutting plaintiff's expert's [opinions]. The jury was free to evaluate and accept his testimony which was subject to cross-examination.

> Dr. Glick gave clear concise medical evidence based testimony with supporting factors for his rationale underlying the opinions he gave at trial. He explained the basis for his opinions from a radiologic perspective given his medical education, training and expertise, and based his opinions on the evidence of record….As the gatekeeper, [the trial] court determined that Dr. Glick was not giving an opinion beyond the scope of his expertise, but simply was offering an opinion from a different standpoint in order to provide an alternative explanation as to the cause of [the Decedent's] bowel perforation.

> At trial, Dr. Glick opined from a radiologic perspective what may have caused [the] perforation. He explained that the perforation that he saw in the January study was in the posterior wall of the sigmoid colon, which was the same area of the [thickening of the colon wall identified in Dr. Shah's May 3, 2012, CT scan report]. This perforation was not near the subject tumor at that particular point in time or on the December study. His opinion was that the perforation occurred from the disease of the sigmoid colon which was most likely diverticulitis.

***

> Dr. Glick [explained] that the barium enema study of the [Decedent's] sigmoid colon showed thickening of the wall and diverticulosis of the colon. He knew that the patient had diverticular disease and had kinking, which is usually due to adhesions.
>
> On the CT scan from May 2012, Dr. Glick stated he could see very subtle linear lines coming from the sigmoid colon and going down to the fat around it, which meant to him that there had been a prior episode of inflammation. Based on this, he knew that the patient had a prior bout of diverticulitis. He referred to this as chronic diverticular disease and stated that thickening in the [colon] and the adhesions and the kinking told him that there is an underlying [problem] there.

Trial Court Opinion, filed 5/6/19, at 5-6.

We agree with the trial court's sound reasoning. Dr. Glick, a board-certified gastrointestinal radiologist, offered an opinion as to causation based on his review of CT scans, as well as a barium enema. Dr. Glick testified he has specialty training in abdominal CT scanning and gastrointestinal radiology, and he testified he has performed "thousands" of barium enemas. N.T., 4/26/17, at 76. Moreover, Dr. Glick was a clinical professor of radiology at the Hahnemann University from 1991 to 2001, as well as at the University of Pennsylvania from 2001 to the time of trial in 2017. *Id.* at 77. Additionally, he has published on the issue of gastrointestinal radiology. *Id.* at 80. Accordingly, the trial court did not abuse its discretion in concluding Dr. Glick demonstrated that he has a "reasonable pretension to specialized knowledge on the subject matter in question." *Freed*, 910 A.2d at 73 (quotation and quotation marks omitted).

Next, Appellant argues the trial court erred in concluding that Dr. Glick qualified as an expert for causation purposes under the MCARE Act standard. Specifically, he contends Dr. Glick does not meet the requirements of Subsections 1303.512 (a) and (b). We note this issue involves the interpretation of the MCARE Act and presents a question of law. *See Renna*, *supra*. Accordingly, our standard of review is *de novo* and our scope of review is plenary. *Id.*

The MCARE Act relevantly provides:

**(a) General rule.**--No person shall be competent to offer an expert medical opinion in a medical professional liability action against a physician unless that person possesses sufficient education, training, knowledge and experience to provide credible, competent testimony and fulfills the additional qualifications set forth in this section as applicable.

**(b) Medical testimony.**--An expert testifying on a medical matter, including the standard of care, risks and alternatives, causation and the nature and extent of the injury, must meet the following qualifications:

(1) Possess an unrestricted physician's license to practice medicine in any state or the District of Columbia.

(2) Be engaged in or retired within the previous five years from active clinical practice or teaching.

Provided, however, the court may waive the requirements of this subsection for an expert on a matter other than the standard of care if the court determines that the expert is otherwise competent to testify about medical or scientific issues by virtue of education, training or experience.

40 P.S. § 1303.512(a), (b) (bold in original). The burden to establish an expert's qualifications under the MCARE Act lies with the proponent of the expert testimony. ***Weiner v. Fisher***, 871 A.2d 1283, 1290 (Pa.Super. 2005).

In the case *sub judice*, with respect to Subsection (a), as discussed fully *supra*, the trial court concluded Dr. Glick possesses "sufficient education, training, knowledge and experience to provide credible, competent testimony." ***See*** 40 P.S. § 1303.512(a). More specifically, the trial court properly held Dr. Glick possessed the necessary qualifications to interpret radiology reports related to the gastrointestinal tract so as to provide competent testimony related to causation. ***See*** Trial Court Opinion, filed 5/6/19, at 5-6.

Moreover, with respect to Subsection (b), there is no dispute that Dr. Glick possesses the necessary physician's license to practice medicine in Pennsylvania, as well as in New Jersey, and he has been engaged in active clinical teaching of radiology since 1991. N.T., 4/26/17, at 77-78. Thus, we find the trial court properly permitted Dr. Glick to offer expert testimony on causation under the MCARE Act.

For all of the foregoing reasons, we affirm.

Affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 1/8/20