J-A26017-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| JUSTINE MOLINICK, AS ADMINISTRATRIX OF THE ESTATE OF BRADLEY MOLINICK, DECEASED | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : | |
| JUDE MUGERWA, M.D., CONEMAUGH MEMORIAL MEDICAL CENTER, DLP CONEMAUGH PHYSICIANS PRACTICES, LLC T/D/B/A CONEMAUGH PHYSICIANS GROUP | : : : : : | No. 1483 WDA 2023 |

Appellants

Appeal from the Order Entered November 28, 2023
In the Court of Common Pleas of Cambria County Civil Division at No(s):
2021-3931

BEFORE:  BOWES, J., BECK, J., and BENDER, P.J.E.

MEMORANDUM BY BECK, J.:                    **FILED: February 7, 2025**

Jude Mugerwa, M.D., Conemaugh Memorial Medical Center, and DLP Conemaugh Physicians Practices, LLC T/D/B/A Conemaugh Physicians Groups (collectively "Appellants"), appeal from the portion of the November 28, 2023 order entered in the Cambria County Court of Common Pleas ("trial court") granting the post-trial motion of Appellee, Justine Molinick, as Administratrix of the Estate of Bradley Molinick, Deceased, and awarding her a new trial in this medical malpractice action.  Following our careful review, we conclude that the trial court abused its discretion in awarding Ms. Molinick a new trial based upon its conclusion that the jury's verdict in favor of Appellants was

against the weight of the evidence. Accordingly, we reverse and remand for proceedings consistent with this decision.

## Factual and Procedural Histories

We glean the following from the certified record. At age thirty-six, Mr. Molinick saw his primary care physician, Michaeleen Wilson, D.O., in September 2019 after complaining of shortness of breath. N.T., 9/5/2023, at 99. Dr. Wilson ordered a stress test and a Holter monitor.[1] N.T., 9/8/2023, Defendants' Ex. D (stress test report); N.T., 9/6/2023, at Plaintiff's Exs. 2 (stress test report), 5 (Holter monitor report). Because Mr. Molinick's test results were abnormal, Dr. Wilson referred him to a cardiologist, Dr. Mugerwa.[2] N.T., 9/8/2023, at 86; N.T., 9/5/2023, at 98, 103, 105, 107.

_____

[1] A Holter monitor is a wearable electrocardiogram ("ECG") device that records the heart's electrical activity and is typically worn for twenty-four to seventy-two hours. N.T., 9/8/2023, at 28, 128.

[2] Mr. Molinick's Holter monitor and stress test indicated irregular heartbeats, known as arrhythmias. His Holter monitor showed he had premature ventricular contractions ("PVCs"), which are extra heartbeats coming from the heart's ventricles, twenty-two percent of the time. N.T., 9/8/2023, at 28; N.T., 9/6/2023, Plaintiff's Ex. 5; N.T., 9/5/2023, at 107-08.

His stress test report showed he had asymptomatic "brief episodes of both monomorphic and polymorphic NSVT [non-sustained ventricular tachycardia]" during recovery. N.T., 9/8/2023, Defendants' Ex. D; N.T., 9/6/2023, Plaintiff's Ex. 2. Ventricular tachycardia is a more advanced stage of arrhythmia where there are "runs" of extra heartbeats; monomorphic refers to a uniform "run" and polymorphic refers to a varied "run." N.T., 9/8/2023, at 25-26; N.T., 9/5/2023, at 86, 173-74 (N.T., 8/30/2023, at 45 (deposition of Bruce Charash, M.D.)). His Holter monitor report indicated that he had "an episode of polymorphic ventricular tachycardia less than 3 seconds in duration." N.T., 9/6/2023, Plaintiff's Ex. 5.

Dr. Mugerwa first examined Mr. Molinick on October 25, 2019, reviewing his history, bloodwork, stress test, and Holter monitor results, noting he had no evidence of ischemia, reduction in blood supplied to the heart, or angina.[3] N.T., 9/5/2023, at 96-98. Mr. Molinick did not report any prior personal cardiac history or family cardiac history. *Id.* at 104; N.T., 9/6/2023, Plaintiff's Ex. 3 (Dr. Mugerwa's progress notes dated 10/25/2019). He had high cholesterol and hypertension, which were being treated by his primary care physician and controlled with medication. N.T., 9/8/2024, at 80; N.T., 9/5/2023, at 103-04, 173-74 (N.T., 8/30/2023, at 65-66 (deposition of Bruce Charash, M.D.)). Using a cardiac risk assessment tool,[4] Dr. Mugerwa calculated Mr. Molinick at low risk of coronary artery disease ("CAD"),[5] but

_____

[3] Ischemia is a lack of blood supply to the heart. N.T., 9/5/2023, at 82-83. Angina is chest pain resulting from a reduced blood supply to the heart. *Id.* at 86.

[4] The online calculator tools assess patients' risk by considering several factors, such as age, sex, race, cholesterol level, blood pressure, history of smoking or diabetes, and whether they are on hypertensive treatment, a statin, or aspirin therapy. N.T., 9/8/2023, at 114-20.

[5] In general, CAD is a build-up of plaque in the coronary arteries. N.T., 9/5/2023, at 81-82. It is generally diagnosed through a patient's history and physical examination and a continuum of tests, starting with an ECG and depending on test results, an echocardiogram, stress test, coronary computed tomography angiography ("CTA"), cardiac MRI, and cardiac catheterization. *Id.* at 82.

Mr. Molinick's estimated risk for a coronary disease event was approximately two to four percent. *Id.* at 114-20, Defendants' Exs. U (Cardiovascular Risk Assessment (10-year, American College of Cardiologists ("ACC")/American Heart Association("AHA"))), V (ACC Atherosclerotic Cardiovascular Disease
*(Footnote Continued Next Page)*

because his test results indicated non-sustained monomorphic and polymorphic ventricular tachycardia,[6] Dr. Mugerwa assessed Mr. Molinick at low-to-intermediate risk for a coronary disease event, which warranted further evaluation. N.T., 9/8/2023, at 121; N.T., 9/5/2023, at 107. Dr. Mugerwa prescribed Mr. Molinick a beta-blocker medication[7] and ordered two tests to evaluate his heart: an echocardiogram and a CTA.[8] N.T., 9/8/2023, at 123.

Mr. Molinick underwent these tests in November 2019. His echocardiogram indicated his heart function was mildly decreased.[9] *Id.* at 33-

_____

("ASCVD") Risk Estimator Plus). His ten-year risk was lower than the five percent risk rate for the general population. *Id.* at 116-17.

[6] Although Mr. Molinick's stress test report showed he had brief episodes of both monomorphic and polymorphic non-sustained ventricular tachycardia, throughout trial, the bulk of testimony was dedicated to polymorphic ventricular tachycardia, which the trial court refers to as "PVT." For ease of the reader, we also refer to it as PVT.

For non-sustained PVT, the arrhythmia lasts less than thirty seconds, whereas sustained PVT lasts more than thirty seconds. N.T., 9/8/2023, at 26, 97.

[7] Beta-blocker medication slows the heart and stabilizes electrical activity. N.T., 9/8/2023, at 123. Dr. Mugerwa prescribed it to suppress Mr. Molinick's PVCs. *Id.* at 35, Defendants' Ex. C (Mr. Molinick's medical records).

[8] The parties agreed that a CTA is the standard of care for a patient at low-to-intermediate risk of a coronary disease event. N.T., 9/5/2023, at 91-92.

[9] Mr. Molinick's ejection fraction was forty-five to fifty percent. N.T., 9/8/2023, at 34. Ejection fraction refers to the output of blood from the heart with a single beat; a normal level is between fifty-five and sixty percent. *Id.* Mr. Molinick's mild depression of heart function was global over the entire heart without a focality, suggesting it was not related to a coronary issue but more likely a result of the PVCs. *Id.*

34, Defendants' Ex. F (echocardiogram report dated 11/26/2019). His CTA showed no evidence of CAD. *Id.*, Defendants' Ex. G (CTA report).

Mr. Molinick followed up with Dr. Mugerwa on December 6, 2019. *Id.,* Defendants' Ex. C. Mr. Molinick continued to have no chest pain and was no longer experiencing shortness of breath. *Id.* Dr. Mugerwa reviewed the CTA and noted it showed normal coronaries. *Id.* He ordered a cardiac event monitor[10] to estimate Mr. Molinick's PVC burden. *Id.* at 35, Defendants' Ex. C. The cardiac event monitor results showed that Mr. Molinick was maintaining normal heart rhythm with no significant arrhythmias and that the beta-blocker medication was successfully managing Mr. Molinick's PVCs. *Id.* at 36, 128, Defendants' Ex. H (cardiac event monitor report). It indicated one single PVC during the two weeks he wore the device and showed no ventricular tachycardia, sustained or non-sustained. *Id.*

As instructed, Mr. Molinick followed up with Dr. Mugerwa approximately six months later on June 12, 2020. *Id.*, Defendants' Ex. C. Mr. Molinick continued to have no chest pain or shortness of breath. *Id.* Dr. Mugerwa noted normal coronaries and significant improvement with his PVCs. *Id.* Dr. Mugerwa ordered a second echocardiogram to reassess Mr. Molinick's heart function. *Id.* at 130, Defendants' Ex. C. On August 28, 2020, Mr. Molinick's second echocardiogram report indicated that the study had technical

_____

[10] A cardiac event monitor is a wearable ECG device that that is typically worn by a patient for two to four weeks. N.T., 9/8/2023, at 128-29.

difficulties because of Mr. Molinick's heart rhythm, but showed normal heart function with his ejection fraction improved to fifty-five to sixty percent, which is within normal range. *Id.*, Defendants' Ex. C.

Mr. Molinick sadly died on November 10, 2020; his autopsy showed evidence of CAD in the right coronary artery. N.T., 9/8/2023, at 48, 140, Defendants' Ex. B (report of Ryan Tedford, M.D.); N.T., 9/6/2023, at 173-74 (N.T., 8/30/2023, at 71 (deposition of Bruce Charash, M.D.)).

On November 10, 2021, Ms. Molinick filed a complaint against seven defendants claiming their negligence caused Mr. Molinick's death.[11] During a four-day jury trial in September 2023, and of relevance to this matter, the jury heard conflicting expert opinion testimony regarding whether Mr. Molinick should have received a cardiac catheterization. Ms. Molinick presented expert testimony from cardiologist Bruce Charash, M.D. and Appellants presented expert testimony from Dr. Mugerwa[12] and cardiologist Ryan Tedford, M.D.

On September 11, 2023, the jury returned a verdict in favor of Appellants. On September 20, 2023, Ms. Molinick filed a post-trial motion

---

[11] The following defendants were named in the complaint: Dr. Mugerwa; Conemaugh Memorial Medical Center; DLP Conemaugh Physician Practices, LLC t/d/b/a Conemaugh Physicians Group; Conemaugh Health System; Duke Lifepoint Healthcare, LLC; Anthony Scuderi, M.D.; and Cambria Somerset Radiology. Ms. Molinick settled her claims against Dr. Scuderi and Cambria Somerset Radiology. At the close of Ms. Molinick's case at trial, the trial court granted non-suit to Conemaugh Health System and Duke Lifepoint Healthcare, LLC.

[12] The trial court qualified Dr. Mugerwa as an expert witness in the field of cardiology and cardiovascular disease. N.T., 9/8/2023, at 95.

alleging, in part, that the verdict was against the weight of the evidence and requesting a new trial. After briefing and argument, the trial court granted Ms. Molinick's post-trial motion on weight-of-the-evidence grounds and awarded her a new trial.[13] This timely appeal followed.

On appeal, Appellants present one issue for our consideration: "Whether the trial court abused its discretion in awarding [Ms. Molinick] a new trial on weight-of-the-evidence grounds where the sole basis for the trial court's decision—its conclusion that [Dr. Mugerwa] contradicted his own expert on critical issues and conceded liability—is not supported by the record?" Appellants' Brief at 5.

## Scope and Standard of Review

"Appellate review of a weight claim is a review of the trial court's exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence." **McFeeley v. Shah**, 226 A.3d 582, 594 (Pa. Super. 2020) (brackets, quotation marks, and citations omitted). "Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence." **Id.** (quotation marks and citations omitted). "One of the least assailable reasons

---

[13] In her post-trial motion, Ms. Molinick also sought relief relating to the trial court's refusal to strike a juror, which the trial court denied. **See** Trial Court Order, 11/28/2023, at 1-2.

for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice." *Id.* (quotation marks and citations omitted).

"The factfinder is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses." *Id.* (quotation marks and citation omitted). "The trial court may award a judgment notwithstanding the verdict or a new trial only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice." *Id.* (quotation marks and citation omitted). "When a fact finder's verdict is so opposed to the demonstrative facts that looking at the verdict, the mind stands baffled, the intellect searches in vain for cause and effect, and reason rebels against the bizarre and erratic conclusion, it can be said that the verdict is shocking." *Id.* (quotation marks and citation omitted). "An appellant is not entitled to a new trial where the evidence presented was conflicting and the fact-finder could have decided in favor of either party." *Id.* (quotation marks and citation omitted).

"In reviewing the entire record to determine the propriety of a new trial, an appellate court must first determine whether the trial judge's reasons and factual basis can be supported." ***Thompson v. City of Philadelphia***, 493 A.2d 669, 673 (Pa. 1985). "Unless there are facts and inferences of record that disclose a palpable abuse of discretion, the trial judge's reasons should prevail." *Id.* "It is not the place of an appellate court to invade the trial

judge's discretion any more than a trial judge may invade the province of a jury, unless both or either have palpably abused their function." *Id.*

> To determine whether a trial court's decision constituted a palpable abuse of discretion, an appellate court must examine the record and assess the weight of the evidence; not, however, as the trial judge, to determine whether the preponderance of the evidence opposes the verdict, but rather to determine whether the court below in so finding plainly exceeded the limits of judicial discretion and invaded the exclusive domain of the jury.

*Id.* (quotation marks and citation omitted).

"Where the record adequately supports the trial court's reasons and factual basis, the court did not abuse its discretion." *Coker v. S.M. Flickinger Co., Inc.*, 625 A.2d 1181, 1187 (Pa. 1993) (citation omitted). "However, if the record discloses that evidence was merely conflicting, then the new trial order would have to be reversed." *Id.* (citing *Burrell v. Philadelphia Elec. Co.*, 265 A.2d 516, 518 (Pa. 1970) (reversing trial court's grant of a new trial on the ground that the verdict was against the weight of the evidence where there was conflicting evidence which supported the jury's verdict)). "This is because in that situation, the trial court invaded the province of the jury." *Id.* (citing *Carroll v. City of Pittsburgh*, 84 A.2d 505, 510 (Pa. 1951) (reversing trial court's grant of a new trial on the ground that the verdict was contrary to the evidence and observing that "[w]hile th[e appellate] court usually supports the action of the trial court in granting or refusing a new trial[,] we do not entirely abdicate our reviewing functions in such cases")) (quotation marks and citation omitted).

**Arguments and Analysis**

Appellants argue that the trial court abused its discretion when it granted Ms. Molinick's request for a new trial because the narrow ground upon which it relied—that Dr. Mugerwa's own testimony contradicted the defense's expert witness to establish negligence—is unsupported by the record. Appellants' Brief at 15-29. Appellants further argue that the trial court's reliance on **Vallone v. Creech**, 820 A.2d 760 (Pa. Super. 2003), (discussed infra) is misplaced and that, in this "battle of the experts" trial, the jury was free to reject Ms. Molinick's theory of the case and return a defense verdict. **Id.** at 16, 29-33.

The record reflects that Ms. Molinick's weight-of-the-evidence claim before the trial court focused on the causation element: she contended that the jury's verdict that Dr. Mugerwa's conduct did not fall below the proper standard of care was against the weight of the evidence.[14] **See** Plaintiff's Post-Trial Motion, 9/20/2023, ¶¶ 2-46. In its opinion filed pursuant to

---

[14] In a negligence action,

> the plaintiff must establish the following elements: the defendant owed him or her a duty, the defendant breached the duty, the plaintiff suffered actual harm, and a causal relationship existed between the breach of duty and the harm. To establish the causation element in a professional malpractice action, the plaintiff must show that the defendant's failure to exercise the proper standard of care caused the plaintiff's injury.

**McFeeley**, 226 A.3d at 594-95 (citations, ellipsis, and brackets omitted).

Pa.R.A.P. 1925(a), the trial court set forth the following explanation for its

decision to award a new trial to Ms. Molinick:

> Here the grant of a new trial was based on the [trial c]ourt's conclusion that [Dr.] Mugerwa's own testimony so contradicted the defense's expert witness as to establish negligence. Accordingly, review is limited to a review of this narrow issue.
>
> As is expected in cases such as this[,] the testimony of the plaintiff's and the defendant's expert witnesses differed greatly. The plaintiff's expert, Bruce Charash, M.D. testified that [Mr.] Molinick was at high risk of developing acute CAD because of his non-sustained PVT coupled with his other risk factors. N.T. 9/5/[20]23[, at] 173 (video deposition not transcribed). [Dr.] Charash explained that based on the American College of Cardiology (ACC) guidelines[,] patients with PVT should undergo revascularization to improve their outcomes and increase the odds of survival. *Id.* [Dr.] Charash noted that it did not matter if the PVT was sustained or non-sustained as revascularization reduced the risk of death in either scenario. Based on his review of the guidelines and experience, the recommended treatment for a patient like [Mr.] Molinick was revascularization and ongoing treatment with beta blockers.
>
> The defendant's expert, Ryan Tedford, M.D., testified that [Dr.] Mugerwa's treatment of [Mr.] Molinick was reasonable and met or exceeded the standard of care for a patient presenting as [Mr.] Molinick did. N.T. 9/8/[20]23[, at] 18-82. [Dr.] Tedford opined that non-sustained PVT does not place a patient at high risk for acute CAD or serious cardiac events but did slightly elevate the risk. Here, however, [Mr.] Molinick's overall risk factors did not place him in a high risk category but placed him at a risk of between 1.22% and 4% of developing acute coronary disease. [Dr.] Tedford noted that [Mr.] Molinick displayed no symptoms of serious CAD such as shortness of breath, chest pains, or sustained PVT. [Dr.] Tedford opined that the risks of revascularization, including risk of stroke or death, did not warrant the procedure where there was a single blocked artery absent sustained PVT or some other risk factors. [Dr.] Tedford noted that a 2022 study showed that revascularization did not improve patient outcomes in cases where there was not sustained PVT. On cross-examination[, Dr.] Tedford acknowledged that the 2022 study did not involve patients with CAD similar to [Mr.] Molinick's but

- 11 -

involved a majority of patients with multiple blockages. Further, he agreed that non-sustained PVT would increase the risk of sudden cardiac death within the next year.

In his testimony[, Dr.] Mugerwa explained that non-sustained PVT would increase the risk of a patient suffering CAD events but that based on the totality of [Mr.] Molinick's medical history[,] his risk was relatively low at between 1.22% and 4%. N.T.[,] 9/8/[20]23[, at] 113-[]21. [Dr.] Mugerwa explained that [Mr.] Molinick's Holter monitor evaluation showed non-sustained PVT that on its own would place him at high risk but that when viewed in light of his history and other test results, including the echocardiogram and CTA[,] neither [of] which raised concerns, this was not the case. *Id.* [at] 122. As a result of his evaluation, [Dr.] Mugerwa believed the best course of treatment was medication management involving beta blockers and cholesterol medications coupled with life[]style changes. *Id.* [at] 123.

On cross-examination[, Dr.] Mugerwa agreed that non-sustained PVT placed a patient at high risk and was a sign of silent, or occult, acute CAD, meaning the patient had none of the normal symptoms. *Id.* [at] 134-35. Specifically[, Dr.] Mugerwa agreed that non-sustained PVT was one symptom of a silent crisis. *Id.* [at] 138. In addition, [Dr.] Mugerwa noted that based on a 2007 ACC report[,] 50% of cases of acute coronary crisis are silent or lacking symptoms and that one-third of such cases had symptoms other than chest pain such as non-sustained PVT. *Id.* [at] 136-38. [Dr.] Mugerwa agreed that the 2021 ACC guidelines indicated that in patients with non-sustained PVT[,] revascularization improved patient outcomes and reduced the risk of death from coronary incidents. *Id.* [at] 139. [Dr.] Mugerwa testified that it was noted on [Mr.] Molinick's CTA that the blocked artery was a small blood vessel and that CTA results should not be solely relied on since catheterization yields a better view of the blocked artery. Finally, [Dr.] Mugerwa agreed that doctors should maintain a high degree of suspicion in patients at high risk for developing silent acute CAD. *Id.* [at] 135.

While it should be expected that [Drs.] Charash and Tedford would testify as they did, [Dr.] Mugerwa's testimony was what shocked the [conscience] of [the trial court] as he admitted that [Dr.] Charash was correct in his assessment that patients with non-sustained PVT were at high risk of a coronary incident and that revascularization would improve their outcomes. Further, he

testified that patients presenting with non-sustained PVT should be viewed with suspicion.

Trial Court Opinion, 4/2/2024, at 6-8. Relying on **Vallone**, the trial court continued:

> [Dr.] Mugerwa's testimony established that: he knew [Mr.] Molinick's non-sustained PVT placed him at higher risk of suffering a coronary incident; the CTA revealed [Mr. Molinick's] blocked vessel was "small"; that 50% of cardiac crisis cases are silent; that one-third of cardiac crisis cases present with symptoms other than chest pain; that non-sustained PVT is one symptom of a silent cardiac crisis; that revascularization improved patient outcomes in patients with non-sustained PVT including the risk of death; and that doctors should maintain high suspicion in patients with non-sustained PVT. Effectively[, Dr.] Mugerwa's testimony undercut his own expert's testimony as to the appropriate standard of care and supported [Dr.] Charash's testimony in this regard. Similar to the doctor's testimony in **Vallone**, [Dr.] Mugerwa's admissions show that had he pursued a more aggressive treatment, as recommended by the ACC, [Mr.] Molinick's odds of survival would have improved. [Dr.] Mugerwa admitted that patients presenting as [Mr.] Molinick did, should be treated as being at high risk for coronary events and their CAD viewed with increased suspicion warranting increased intervention. Further, he admitted the care he provided fell below this standard as he failed to follow this course of treatment. In light of these admissions[,] the jury's verdict finding no negligence truly shocked the [trial c]ourt's [conscience].

*Id.* at 9.

Our review requires us to examine whether there is record support for the trial court's reason for granting a new trial. *See Thompson*, 493 A.2d at 673. We therefore address each of the trial court's findings as to Dr. Mugerwa's testimony in turn.

<u>Mr. Molinick was at high risk of cardiac death</u>

First, the trial court stated that Dr. Mugerwa "explained that [Mr.] Molinick's Holter monitor evaluation showed non-sustained PVT that on its own would place him at high risk but that when viewed in light of his history and other test results, including echocardiogram and CTA[,] neither of which raised concerns, this was not the case." Trial Court Opinion, 4/2/2024, at 7 (citing N.T., 9/8/2023, at 122). The notes of testimony from trial, however, reveal that Dr. Mugerwa did not testify as the trial court found—that Mr. Molinick's non-sustained PVT, on its own, placed him at high risk of suffering death from an acute coronary crisis:

Q Thank you. The 22 percent burden of PVC on the Holter monitor, you testified at your deposition that was very high. Correct?

A Yes.

Q Why is that significant here for Mr. Molinick?

A It means he is at risk for sudden cardiac death.

Q So you were aware of this risk?

A Yes, I was aware.

Q But in your opinion, at the time, was he at high risk?

A No.

Q So all this information tells you this patient needs to be worked up, is that fair?

A Yes.

Q So at this first visit you did three things. Correct?

A Yes.

Q      What was the first thing you did?

A      So I started him on a beta blocker.

Q      Okay.

A      Which is a medication to slow the heart, but also stabilizes the electrical activity.

Q      You said stabilizes the electrical activity.  And then you ordered two tests.  Right?

A      Yes.  I ordered an echocardiogram and then I ordered the coronary CT.

Q      Okay.  Doctor, why not just cath him?

A      He did not have unstable symptoms.

Q      Okay.  You perform diagnostic catheterizations.  What are the risks of a catheterization, Doctor?

A      The first one is death.  You can cause a heart attack.

Q      Okay.

A      You can dissect or tear a vessel.

Q      Tear a vessel.  Is that using a device to look at the artery?

A      Yes.  With the catheter you can perforate a vessel and cause a significant amount of bleeding.

Q      I'm sorry, cause how much bleeding?

A      A significant amount of bleeding.

Q      A significant amount of bleeding.  What else?

A      You can induce abnormal rhythms.  You can also cause a stroke.

- 15 -

Q      So those are all the risks or some of the risks, more significant risks of a catheterization?

A      Yes.

Q      Is this something you wanted to subject Mr. Molinick to?

A      Absolutely not.

Q      So why did you order the coronary CT angiogram?

A      A Coronary CT is the first thing for testing a patient like Mr. Molinick.  It is safe, effective, reliable, and fast.  The other thing to recognize is that only about 35 percent of patients with stable symptoms who end up with cardiac cath actually end up needing an intervention.

N.T., 9/8/2023, at 122-24; **see also id.** at 113 (Dr. Mugerwa testifying that non-sustained PVT placed Mr. Molinick "just at risk" but not "close to death").

At the outset, as discussed below, the cited testimony did not refer in any respect to an increased risk of harm based upon Mr. Molinick's non-sustained PVT; instead, Dr. Mugerwa testified to Mr. Molinick's Holter monitor results showing he had an extra heartbeat (PVC) twenty-two percent of the time.  **See id.** at 122.  Further, although Dr. Mugerwa testified that Mr. Molinick was "at risk," he unequivocally testified that the PVC reading did not place him at high risk for sudden cardiac death.  We therefore do not find this trial court's finding to be supported by the record.

Patients with non-sustained PVT are at high risk of silent disease

Next, the trial court stated: "On cross-examination, Dr. Mugerwa agreed that non-sustained PVT placed a patient at high risk and was a sign of silent, or occult, acute CAD, meaning the patient had none of the normal symptoms."

- 16 -

Trial Court Opinion, 4/2/2024, at 7 (citing N.T., 9/8/2023, at 134-35). In the testimony cited by the trial court, Dr. Mugerwa testified as follows:

Q    You mentioned that in the case of polymorphic v-tech, that could sometimes indicate – in the non-sustained kind, the short kind – that can sometimes indicate occult disease?

A    Yes.

Q    Which you also described as silent disease?

A    Yes.

Q    What is that?

A    So I mean, somebody could be having a cardiomyopathy. The heart muscle could be having electrical abnormalities, genetic electrical abnormalities, could be having silent coronary disease. There are all kinds.

Q    What does the word silent mean? Why use the word silent?

A    If persons were having overt [sic] symptoms.

Q    If it was overt symptoms it would not be silent. Right?

A    Right.

Q    So when you say that polymorphic ventricular tachycardia, the non-sustained kind, may be an indicator of silent disease, that means there may be disease there without symptoms. Correct?

A    Yes.

Q    And certainly I think we can agree, Doctor, that healthcare providers like yourself should maintain suspicion, high suspicion when evaluating the groups of people at high risk for silent or unrecognized coronary artery disease?

A    Yes.

Q       Meaning that even if there are no symptoms, quote-unquote, that as you said, the disease could be there, it's just silent. Correct?

A       Yes.

Q       And the polymorphic v-tech could be an indicator of that?

A       Could be, yes.

N.T., 9/8/2023, at 134-35.

We do not find support in this passage for the trial court's conclusion that Dr. Mugerwa agreed that non-sustained PVT placed a patient at high risk. Rather, as the above exchange shows, Dr. Mugerwa agreed that non-sustained PVT could be an indicator of silent coronary disease, but he did not state that it placed a patient at high risk. The only mention of "high risk" in the above-cited testimony referred to patients at high risk for silent CAD—wherein Dr. Mugerwa agreed that non-sustained PVT could be an indicator of silent disease, and **if** a patient is at high risk for silent disease, doctors should maintain "high suspicion." Nowhere in this testimony did Dr. Mugerwa say that a patient with non-sustained PVT was at high risk. Rather, Dr. Mugerwa repeatedly testified that Mr. Molinick was not in high risk group. *Id.* at 113-23.

The trial court's finding that Dr. Mugerwa "agreed that non-sustained PVT was one symptom of a silent crisis" is supported by the record. *See* Trial Court Opinion, 4/2/2024, at 7 (citing N.T., 9/8/2023, at 138 (Dr. Mugerwa agreeing on cross-examination with the statement: "And I think you testified

- 18 -

earlier that one of the ways you can detect a silent crisis, a crisis without symptoms like chest pain, is by seeing the presence of non-sustained – a short run – of polymorphic ventricular tachycardia. Correct?")); *see id.* However, Dr. Mugerwa never agreed that, because Mr. Molinick experienced non-sustained PVT, he was in silent crisis or that he should have been highly suspicious that this could be the case; in fact, Dr. Mugerwa specifically denied this in his testimony:

> Q      You were asked at the beginning of cross-examination regarding an occult or silent disease process going. Was there any reason to suspect that in Bradley Molinick when you were treating him?
>
> A      No.
>
> Q      Is that because of the PVC, that that would explain what was going on in his heart?
>
> A      Yes.
>
> Q      From everything you know?
>
> A      Yes. I looked that the PVCs had caused some cardiac remodeling and hence his reduced ejection fraction.

N.T., 9/8/2023, at 142-43. Further, as Dr. Mugerwa explained on direct examination:

> Q      So what about the polymorphic changes [(non-sustained PVT)] that were so dangerous according to Dr. Charash? What significance did that have for you here?
>
> A      It showed maybe there's some occult disease or some electrical instability.
>
> Q      Did you say occult disease?

- 19 -

A    Yes, occult.

Q    What does that mean?

A    Silent.

Q    Or some electrical instability?

A    Yes.

Q    Can you tell this jury your deferential diagnosis for Mr. Molinick?

A    So at this time I'm thinking that he might have cardiomyopathy.

Q    Okay.

A    The structure of the heart is not normal. It's weak.

Q    The structure of the heart is weak.

A    I'm thinking that he might have some electrical abnormality.

Q    Okay.

A    And there are many causes for that.

Q    You were looking for the cause of that?

A    Yes.

Q    Is coronary artery disease in your thought process?

A    Yes.

Q    Were the findings of the stress test consistent with acute or unstable coronary syndrome?

A    No.

Q    Why not?

A      The patient did not have symptoms.  He did not have ST elevation or ST depression.  He did not have sustained abnormal [ventricular tachycardia] readings.  He was not hypertensive and he did not have blood markers.

Q      He did not have blood markers, okay.  Is an acute or unstable coronary syndrome always symptomatic?

A      Yes.

Q      Was Mr. Molinick suffering an acute coronary crisis because of a blockage as Dr. Charash suggested?

A      No.

Q      And how can you determine that?

A      Again, he was not having symptoms.  He did not have sustained abnormal [ventricular tachycardia] readings.  He was not hypertensive.  He did not have ST elevation or ST depression.  And he did not have the blood markers.

N.T., 9/8/2023, at 109-11.  Accordingly, we do not find this testimony supports the trial court's conclusion that Dr. Mugerwa agreed that non-sustained PVT placed any patient, including Mr. Molinick, at high risk.

<u>Dr. Mugerwa did not provide ACC recommended treatment</u>

Next, the trial court found that: "[Dr.] Mugerwa agreed that the 2021 ACC guidelines indicated that in patients with non-sustained PVT[,] revascularization improved patient outcomes and reduced the risk of death from coronary incidents" and that Dr. "Mugerwa's admissions show that had he pursued a more aggressive treatment, as recommended by the ACC, [Mr.] Molinick's odds of survival would have improved."  Trial Court Opinion,

4/2/2024, at 7, 9 (citing N.T., 9/8/2023, at 139). The record reflects that Dr.

Mugerwa's testified as follows:

Q    If we go to the 2021 guidelines real quick and go to that next page. It's E58. So this section of the 2021 guidelines for coronary re-vascularization, if you go to the synopsis paragraph, it starts with the word observation on the left-hand side. Observational studies have shown that re-vascularization – that's the catheter; right – catheter with stent placement **in patients with life-threatening ventricular arrhythmias** is associated with arrhythmia reduction and improved survival. Do you see that?

A    Yes. I see that.

Q    And then if you go to the paragraph below: Patients who survived cardiac arrest or have ventricular fibrillation or polymorphic ventricular tachycardia, re-vascularization with either CABG – that's bypass surgery – or PCI, which is the catheter; right – is associated with a lower likelihood of death. Can we agree?

A    Yes.

N.T., 9/8/2023, at 138-39 (emphasis added). On redirect examination, Dr.

Mugerwa clarified that the 2021 guidelines referred to during cross-

examination were not applicable to Mr. Molinick:

Q    This is the 2021 guidelines, because it was the one that began with patients that survived cardiac arrest, that was the start of that paragraph. So that's fine. We don't need that. Here it is. So he's talking about the recommendation for a specific supportive test. The very first few words are: **In patients who survive cardiac arrests**. Do you see that, Doctor?

A    Yes.

Q    Then it goes on to talk about re-vascularization or PCI. Correct?

A      Yes.

Q      At the time you were treating Mr. Molinick, was he a patient
       who had survived cardiac death [sic]?

A      No.

N.T., 9/8/2023, at 142 (emphasis added).

The trial court misconstrued Dr. Mugerwa's testimony, failing to include a critical component: Mr. Molinick was not a patient to whom the ACC's 2021 guidelines applied, i.e., a patient with life-threatening ventricular arrhythmia or who had survived cardiac arrest.[15]    Indeed, Dr. Mugerwa's acknowledgement of these 2021 guidelines is consistent with his own expert opinion, as well as that of his hired expert, Dr. Tedford, that Mr. Molinick's non-sustained PVT did not require catheterization because he was not in acute coronary crisis: he had no unstable symptoms; he had no ischemia; his CTA indicated with approximately 99% accuracy no stenosis and an absence of CAD; he had no S.T. elevation or depression; he did not have sustained ventricular tachycardia; his non-sustained PVT had virtually stopped after being prescribed beta blockers; he did not have a personal or family cardiac history; and his 10-year risk for a coronary event was only about 2 to 4

_____

[15] We note that in cross-examination, counsel identified PVT as a phrase appearing in the second referenced paragraph of the 2021 ACC guidelines.  As recounted by counsel, "Patients who … have … polymorphic ventricular tachycardia … is associated with a lower likelihood of death."  N.T., 9/8/2023, at 139.  The referenced 2021 ACC guidelines are not in the certified record on appeal; counsel's statement is therefore the only information we have in the record before us.

percent, which was less than the 5 percent rate for the general population. N.T., 9/8/2023, at 110-33.

Moreover, while the trial court correctly recounted Dr. Mugerwa's testimony that the 2007 ACC report indicated that fifty percent of acute myocardial infarction cases are silent, Dr. Mugerwa did not testify that silent cases must be treated with catheterization. *See* Trial Court Opinion, 4/2/2024, at 7 (citing N.T., 9/8/2023, at 136-38). To conclude otherwise would mean catheterization is required even if the patient has no overt symptoms and is not otherwise in the high risk category—a statement not found anywhere in Dr. Mugerwa's testimony and, to the contrary, entirely contradicts what he said on the stand. Simply put, Dr. Mugerwa's testimony confirming what the ACC guidelines suggest for patients with life-threatening arrhythmias or who had survived cardiac arrest did not establish that Dr. Mugerwa agreed catheterization was appropriate for a patient presenting as Mr. Molinick did.

CTA results unreliable for blocked blood vessels that are small

We next examine the trial court's finding that "[Dr.] Mugerwa testified that it was noted on [Mr.] Molinick's CTA that the blocked artery was a small blood vessel and that CTA results should not be solely relied on since catheterization yields a better view of the blocked artery." Trial Court Opinion, 4/2/2023, at 8-9. The trial court does not provide a citation to Dr. Mugerwa's testimony in support of this finding. Based upon our review of the record, we

discern the trial court is referring to Dr. Mugerwa's testimony regarding Mr. Molinick's CTA report prepared by radiologist Dr. Scuderi. The CTA report indicated: "RCA: No visible stenosis. Small vessel." ***See*** N.T., 9/8/2023, Plaintiff's Ex. G. On direct examination, Dr. Mugerwa testified as follows:

> Q    Now, Dr. Scuderi, we played his deposition. He did indicate that there was an artifact because of the size of Mr. Molinick and his vessels. Is there anything in the report to suggest that his interpretation was not as accurate or less reliable because of an artifact?
>
> A    It is not in his report.
>
> Q    So what about the results themselves?
>
> A    There was no visible stenosis.

N.T., 9/8/2023, at 126. Additionally, on the first day of trial, the following exchange occurred when counsel for Ms. Molinick questioned Dr. Mugerwa as if on cross-examination:

> Q    … Whereas if the risk of coronary artery disease was more on the high risk end, right, would it be more appropriate at that point to bypass the CAT scan and just go straight for catheterization. And your … answer was what?
>
> A    Yes.
>
> Q    Yes. That would be –
>
> A    Can I elaborate?
>
> Q    I'm sorry?
>
> A    Can I elaborate?
>
> Q    Elaborate, sure. Go ahead.

A    In this case what I meant by high risk, so if a patient comes with known coronary artery disease; he's having acute coronary syndrome; he's having unstable symptoms; then, definitely bypass the coronary C.T. and go straight to cardiac cath.

Q    Again, we agree, I think, that the CAT scan or C.T.A. is more appropriate for a patient in the low to intermediate risk?

A    Yes.

Q    Okay. I want to make sure we mark that down as something we agree on. C.T.A., which will sometimes accidentally call a CAT scan, is appropriate for a low to, I'll say, intermediate risk patient, correct?

A    Yes.

Q    I think as we just described, the catheter is appropriate for somebody who reaches that high risk profile, correct?

A    Yes.

Q    All right. I hope my chicken scratch is legible. And that's the standard that you follow today; isn't that right?

A    Yes.

Q    And can you tell us why that is? Why is it that in a high risk patient, you skip the C.T.A. and just go straight to catheterization?

A    Because they are – the pathophysiology is totally different, so if a patient who is having acute coronary syndrome, in this case a plaque rupture, acute plaque rupture – if I have a patient who is presenting with acute coronary syndrome, which in this case plaque rupture with clot formation; he's having S.T. elevation; he's hypertensive; he's unstable; then, obviously, you know, you can do a cardiac catheterization because then you can deliver immediate intervention.

Q    Okay. So you wouldn't look at a patient who may be suffering an acute coronary syndrome and say, I can't do a

catheterization because the catheterization might kill them? You would proceed with the catheterization, correct?

A    Yes.

Q    All right.

A    Unless there's a contraindication.

Q    Sure.  Can we agree that a catheterization, generally speaking, provides a clearer view of the arteries and what's going on there than a C.T.A.?

A    In most cases, yes.

Q    In most cases, yes.  I'm going to mark that down as well as something we can agree on.  So in most cases the cath gives you a clearer view than the C.T.A.  And because of that, because of that, the catheterization has a higher, what you sometimes might call, diagnostic yield, more accuracy in diagnosis; can we agree?

A    Yes.

N.T., 9/5/2023, at 91-93.

Again, the trial court mischaracterized Dr. Mugerwa's testimony, as at no time does he testify that Mr. Molinick's CTA results were unreliable.  Dr. Mugerwa agreed that in most cases, a cardiac catheterization provides a clearer view of the arteries, but he did not testify, as the trial court stated, that this was a reason not to rely on the result of Mr. Molinick's CTA.  The parties do not dispute that Mr. Molinick's CTA report failed to reveal any evidence of CAD.  **See** N.T., 9/8/2023, Plaintiff's Ex. G.  Although Dr. Mugerwa acknowledged the CTA report indicated a small vessel, there is absolutely no testimony by him to establish that catheterization is the standard of care for

a patient whose CTA indicates a small vessel. Moreover, the above-cited testimony further confirms that Dr. Mugerwa consistently testified that a CTA, and not catheterization, was appropriate for a patient who, like Mr. Molinick, was at low to intermediate risk; Dr. Mugerwa merely agreed that it may be appropriate to skip the CTA and go straight to cardiac catheterization for a patient who, unlike Mr. Molinick, was presenting with acute coronary syndrome or was otherwise at high risk.

### *Vallone*

As noted, the trial court relied on *Vallone* in support of its decision to grant Ms. Molinick's request for a new trial. There, a patient with a history of breast cancer who underwent a lumpectomy returned to her doctor when she noticed significant breast changes. *Vallone*, 820 A.2d at 762. The doctor ordered some testing, but did not perform a biopsy. *Id.* When the patient returned about fourteen months later with a red rash on her breast, the doctor ordered a biopsy, which revealed a recurrence of cancer. *Id.* At trial, the doctor testified that when he first examined the patient for breast changes, he believed there was a twenty percent chance the cancer had recurred and an eighty percent chance the changes were from radiation, yet failed to order a biopsy until fourteen months later. *Id.* at 763-64. The jury returned a defense verdict. *Id.* at 762. The trial court granted the plaintiff's post-trial motion for a new trial on two bases: (1) a lack of rational explanation for the verdict and (2) erroneous jury instructions. *Id.* On appeal, a panel of this

Court affirmed on both bases and found no abuse of discretion in the trial court's finding that, where the doctor failed to aggressively treat his patient for what he admitted was a twenty percent possibility of recurrent cancer, the jury's finding of no negligence shocked its conscious. *Id.* at 764.

We find *Vallone* distinguishable. Contrary to the trial court's conclusion, Dr. Mugerwa never admitted that Mr. Molinick was at high risk for CAD or required a cardiac catheterization, nor did he testify that doctors should maintain high suspicion for patients presenting with non-sustained PVT.[16] As discussed above, he consistently testified that Mr. Molinick was at low to intermediate risk and did not require catheterization because he was not in acute coronary crisis or symptoms that would suggest anything of concern. *See* N.T., 9/8/2023, at 110-33. In fact, there is no dispute that Mr. Molinick's presentation was improving with the interventions Dr. Mugerwa employed. *Id.* at 38, 81 (Dr. Tedford), 130, 132-33 (Dr. Mugerwa); N.T., 9/5/2023, at 173-74 (N.T., 8/30/2023, at 82-84) (Dr. Charash). Therefore, the trial court's reliance on *Vallone* is misplaced and cannot be the basis for a new trial.

---

[16] We note that the trial court did not include a citation to the record in support of these conclusions. *See* Trial Court Opinion, 4/2/2024, at 9. Indeed, Ms. Molinick agrees that Dr. Mugerwa did not expressly admit that his conduct fell below the standard of care. *See* Ms. Molinick's Brief at 7 ("[T]he trial court's finding that Dr. Mugerwa 'admitted the care he provided fell below' the standard of care was not based on an express, verbal admission of negligence[.]") (citing Trial Court Opinion, 4/2/2024, at 9).

**Conclusion**

As the foregoing analysis shows, the purported "admissions" by Dr. Mugerwa that the trial court relied upon to conclude they "undercut" Dr. Tedford's testimony and supported Dr. Charash's as to the appropriate standard of care are unsupported in the record. ***See*** Trial Court Opinion, 4/2/2024, at 9. To the contrary, the record demonstrates that Dr. Mugerwa testified consistently with his own expert, Dr. Tedford. Dr. Mugerwa testified that he followed the appropriate standard of care in treating Mr. Molinick and if a future patient presented as Mr. Molinick did, he would treat the patient in the same manner as Mr. Molinick. N.T., 9/8/2023, at 133, 141; ***see also id.*** at 110-32. This is consistent with Dr. Tedford's testimony, which opined that Dr. Mugerwa complied with the applicable standard of care when he treated Mr. Molinick. ***Id.*** at 19-20, 35; ***see also id.*** at 20-45, Defendants' Ex. B. Drs. Mugerwa and Tedford both opined that Mr. Molinick was at low to intermediate risk, not high risk, for an acute coronary event and that, as such, cardiac catheterization was not indicated for Mr. Molinick. ***Id.*** at 29-30, 120-23. The record does not show statements by Dr. Mugerwa that contradicted his own expert so as to establish liability and require the submission of the case to a new and different jury. The jury heard the "battle of the experts" testimony, weighed the evidence presented, and decided in favor of Appellants. There is record support for the jury's verdict. The trial court therefore was without a

basis to invade its exclusive domain. **See Coker**, 625 A.2d at 1187; **Thompson**, 493 A.2d at 673.

Because we conclude that the record does not support the trial court's reasoning for granting a new trial—that Dr. Mugerwa contradicted his own expert, Dr. Tedford, and admitted negligence—we are constrained to conclude the trial court abused its discretion. **Coker**, 625 A.2d at 1187; **Thompson**, 493 A.2d at 673; **see also Mader v. Duquesne Light Co.**, 199 A.3d 1258, 1266-67 (Pa. Super. 2018) (citation and quotation marks omitted) (concluding the trial court usurped the jury's fact-finding role and abused its discretion by awarding a new trial as to medical expenses where the jury resolved conflicts in testimony and the evidence supported the jury's determination). We therefore reverse the part of the trial court's order awarding Ms. Molinick a new trial and direct that the trial court enter judgment on the jury's verdict in favor of Appellants.

Order reversed in part. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

2/7/2025